No. 15-15364

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

DONALD WORTMAN, et al.,

*Plaintiffs-Appellees*,

v.

PHILIPPINE AIRLINES, INC.; AIR NEW ZEALAND LTD.;
CHINA AIRLINES, LTD.; EVA AIRWAYS CORP.,

*Defendants-Appellants*.

---

On Appeal from the United States District Court for the
Northern District of California, No. 3:07-cv-05634-CRB

---

## OPENING BRIEF OF DEFENDANTS-APPELLANTS

---

COVINGTON & BURLING LLP
Anita F. Stork
Jeffrey M. Davidson
Rani Gupta
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000

COVINGTON & BURLING LLP
Christian J. Pistilli
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000

*Attorneys for Defendant-Appellant Philippine Airlines, Inc.*

CONDON & FORSYTH LLP
Michael J. Holland
Jean Cooper Rose
7 Times Square
New York, NY 10036
Telephone: (212) 490-9100

*Attorneys for Defendant-Appellant Air New Zealand Ltd.*

SQUIRE PATTON BOGGS (U.S.) LLP
James V. Dick
2550 M Street NW
Washington, DC 20037
Telephone: (202) 626-6600

*Attorneys for Defendant-Appellant China Airlines Ltd.*

KIRKLAND & ELLIS LLP
James H. Mutchnik, P.C.
300 North LaSalle Street
Chicago, IL 60654
Telephone:  (312) 862-2000

Tammy A. Tsoumas
Jonathan J. Faria
Jason Y. Kelly
333 South Hope Street, Suite 2900
Los Angeles, CA 90071
Telephone: (213) 680-8400

*Attorneys for Defendant-Appellant EVA Airways Corp.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel for Petitioners certify:

1.  <u>Philippine Airlines, Inc.</u> is a non-governmental corporate entity.  PAL Holdings, Inc. is the parent corporation of Philippine Airlines, Inc.  PAL Holdings, Inc. is a Philippine corporation that is publicly traded on the Philippine stock exchange.  Trustmark Holdings Corporation, which is not a publicly traded corporation, is the parent company of PAL Holdings, Inc.  The Lucio Tan Group, which is not a publicly traded corporation, is the parent company of Trustmark Holdings Corporation.

Dated:  July 6, 2015                    Respectfully submitted,

COVINGTON & BURLING LLP

By:  */s/ Anita F. Stork*
          Anita F. Stork

*Attorneys for Philippine Airlines, Inc.*

2.     <u>Air New Zealand Limited</u> has no parent corporation and no publicly held entity holds more than 10% of the stock of Air New Zealand Limited.  53.2% of the shares of Air New Zealand Limited's publicly traded stock is owned by Her Majesty the Queen in right of New Zealand (the Crown).

Dated: July 6, 2015                    Respectfully submitted,

CONDON & FORSYTH LLP

By:  */s/ Michael J. Holland*
          Michael J. Holland

*Attorneys for Air New Zealand Limited*

3.     <u>China Airlines, Ltd.'s</u> largest shareholder is the China Aviation Development Foundation.  No publicly held corporation owns 10% or more of the stock of China Airlines, Ltd.

Dated:  July 6, 2015                    Respectfully submitted,

SQUIRE PATTON BOGGS (U.S.) LLP

By:  */s/ James V. Dick*
          James V. Dick

*Attorneys for China Airlines, Ltd.*

4.      <u>EVA Airways Corporation</u> has no parent corporation.  The only corporations that own 10% or more of EVA Airways Corporation's stock are Evergreen Marine Corporation and Evergreen International Corporation.  Both Evergreen Marine Corporation and EVA Airways Corporation are publicly traded on the Taiwan Stock Exchange.

Dated:  July 6, 2015                    Respectfully submitted,

KIRKLAND & ELLIS LLP

By:  *<u>/s/ Tammy A. Tsoumas</u>*
     Tammy A. Tsoumas

*Attorneys for EVA Airways Corp.*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

JURISDICTIONAL STATEMENT ............................................ 3

ISSUES PRESENTED .............................................................. 3

STATEMENT OF THE CASE .................................................. 4

     A.    The Filed Rate Doctrine ........................................ 4

     B.    Regulation Of Rates For International Air Travel .............................. 7

     C.    Regulation Of Fuel Surcharges ........................................ 10

     D.    DOT Complaint Process.................................................... 11

     E.    Proceedings In The District Court...................................... 12

SUMMARY OF THE ARGUMENT ...................................... 15

STANDARD OF REVIEW ...................................................... 20

ARGUMENT ............................................................................ 20

I.    The Filed Rate Doctrine Applies To All Rates For International Air Travel, Whether Or Not They Were Filed.................................................. 20

     A.    Congress Granted DOT Authority Over Unfiled Prices. ................... 21

     B.    DOT Exercised Its Regulatory Authority Over Unfiled Rates. ......... 23

          1.    DOT created and maintained a rate-filing regime. ................. 23

          2.    DOT explicitly asserted its regulatory authority. ................... 27

          3.    DOT created and used a robust complaint process................. 28

     C.    DOT Did Not Abdicate Its Authority Over Unfiled Rates. .............. 29

          1.    DOT did not renounce its authority over rates at the encouragement of Congress.................................................... 31

i

2.      DOT's express reservation of authority over unfiled rates was entitled to deference........................................... 33

3.      It is irrelevant whether DOT accessed unfiled fares................ 34

4.      The frequency with which DOT's complaint process was used is immaterial. ................................................. 35

5.      The district court's distinction between filed and unfiled rates turns agency deference on its head................................ 37

II.     The Filed Rate Doctrine Applies To Fuel Surcharges. ................................ 38

A.      The Filed Rate Doctrine Applies Because Fuel Surcharges Were Required To Be Filed. .............................................. 39

B.      The Filed Rate Doctrine Applies Because DOT Did Not Abdicate Its Authority Over Fuel Surcharges.................................... 43

1.      DOT extensively regulated fuel surcharges............................ 43

2.      The district court erred in holding that DOT abdicated its authority over fuel surcharges.................................. 45

III.    The Filed Rate Doctrine Applies To Rates Filed With Foreign Regulators. ..................................................... 47

CONCLUSION ................................................................... 51

STATEMENT OF RELATED CASES ................................................. 53

CERTIFICATE OF COMPLIANCE.................................................... 54

APPENDIX OF STATUTES AND REGULATIONS INVOLVED .................... 55

CERTIFICATE OF SERVICE ........................................................... 67

ii

# TABLE OF AUTHORITIES

**Cases**

*Ark.-La. Gas Co. v. Hall*,
   453 U.S. 571 (1981)....................................................................21, 39

*AT&T v. Cent. Office Tel.*,
   524 U.S. 214 (1998)...........................................................................39

*Auer v. Robbins*,
   519 U.S. 452 (1997)....................................................................34, 40

*Bassiri v. Xerox Corp.*,
   463 F.3d 927 (9th Cir. 2006) ...............................................27, 34, 40

*Carlin v. DairyAmerica, Inc.*,
   705 F.3d 856 (9th Cir. 2013) .......................................................*passim*

*Chevron USA v. Natural Res. Def. Council*,
   467 U.S. 837 (1984)..........................................................................4, 5

*Coll v. First Am. Title Ins. Co.*,
   642 F.3d 876 (10th Cir. 2011) ...........................................................39

*Cost Mgmt. Servs. v. Wash. Natural Gas Co.*,
   99 F.3d 937 (9th Cir. 1996) ...............................................................48

*Crumley v. Time Warner Cable, Inc.*,
   556 F.3d 879 (8th Cir. 2009) .............................................................39

*Dreamscape Design v. Affinity Network*,
   414 F.3d 665 (7th Cir. 2005) .............................................................39

*E. & J. Gallo Winery v. EnCana Corp.*,
   503 F.3d 1027 (9th Cir. 2007) .....................................................*passim*

*E. Ky. Power Co-op v. FERC*,
   489 F.3d 1299 (D.C. Cir. 2007)...........................................................5

*Firstcom, Inc. v. Qwest Corp.*,
   555 F.3d 669 (8th Cir. 2009) .............................................................39

*H.J. Inc. v. Nw. Bell Tel.Co.*,
    954 F.2d 485 (8th Cir. 1992) ................................................................48

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
    754 F. Supp. 2d 1239 (W.D. Wash. 2010) .................................26, 42

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
    647 F. Supp. 2d 1250 (W.D. Wash. 2009) .........................................37

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
    450 F. App'x 685 (9th Cir. 2011) ....................................26, 28, 37, 44

*Heckler v. Chaney*,
    470 U.S. 821 (1985)............................................................................30

*Japan Line, Ltd. v. Los Angeles Cnty.*,
    441 U.S. 434 (1979)............................................................................49

*Keogh v. Chicago & Nw. Ry. Co.*,
    260 U.S. 156 (1922)..............................................................................4

*McCray v. Fidelity Nat'l Title Ins. Co.*,
    682 F.3d 229 (3d Cir. 2012) .........................................................39, 48

*Native Ecosystems Council v. U.S. Forest Serv.*,
    418 F.3d 953 (9th Cir. 2005) ..............................................................34

*Pan Am. World Airways v. C.A.B.*,
    517 F.2d 734 (2d Cir. 1975) ...................................................48, 49, 51

*Pub. Util. Dist. No. 1. of Grays Harbor Cnty. v. IDACORP Inc.*,
    379 F.3d 641 (9th Cir. 2004) ...........................................7, 20, 24, 35

*Pub. Util. Dist. No. 1 of Snohomish Cnty. v. Dynegy Power Mktg.*,
    384 F.3d 756 (9th Cir. 2004) ............................................6, 20, 24, 35

*Riverkeeper, Inc. v. Collins*,
    359 F.3d 156 (2d Cir. 2004) ...............................................................30

*Sec. Servs., Inc. v. K Mart Corp.*,
    511 U.S. 431 (1994)............................................................................42

iv

*Square D Co. v. Niagara Frontier Tariff Bureau*,
476 U.S. 409 (1986) ................................................................. 6, 35, 39

*Taffet v. S. Co.*,
967 F.2d 1483 (11th Cir. 1992) (en banc) ........................................ 48

*Tex. Comm. Energy v. TXU Energy, Inc.*,
413 F.3d 503 (5th Cir. 2005) ............................................................. 48

*Time Warner Entm't Co. v. FCC*,
56 F.3d 151 (D.C. Cir. 1995) ............................................................... 5

*Ting v. AT&T*,
319 F.3d 1126 (9th Cir. 2003) ............................................. 31, 32, 33

*Town of Norwood v. New England Power Co.*,
202 F.3d 408 (1st Cir. 2000) .............................................................. 39

*Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*,
295 F.3d 918 (9th Cir. 2002) .............................................................. 39

*Wah Chang v. Duke Energy Trading & Mktg.*,
507 F.3d 1222 (9th Cir. 2007) .................................................. *passim*

*Wegoland Ltd. v. NYNEX Corp.*,
27 F.3d 17 (2d Cir. 1994) ............................................... 5, 39, 47, 48

*Zivotofsky v. Kerry*,
135 S.Ct. 2076 (2015) ......................................................................... 51

**Statutes**

28 U.S.C. § 1292(b) .............................................................................. 3

28 U.S.C. § 1331 .................................................................................... 3

47 U.S.C. § 160 ................................................................................... 32

49 U.S.C. § 40101 ........................................................................ 21, 22

49 U.S.C. § 40102 ........................................................................ 10, 40

49 U.S.C. § 41309 .............................................................................. 49

v

49 U.S.C. § 41501 ...................................................................................7

49 U.S.C. § 41504 ..............................................................................8, 22

49 U.S.C. § 41507 ...................................................................................8

49 U.S.C. § 41509 .................................................................12, 13, 22, 29

49 U.S.C. § 46101 .................................................................................11

Airline Deregulation Act,
    Pub. L. No. 95-504, 92 Stat. 1705 (1978) ........................................7

Federal Aviation Act of 1958,
    Pub. L. No. 85-726, 72 Stat. 731 (1958)...........................................7

International Air Transportation and Competition Act,
    Pub. L. No. 96-192, 94 Stat. 35, 36 (1980) ...................................7, 22

**Other Authorities**

14 C.F.R. § 293.10 ............................................................................9, 24

14 C.F.R. § 302.17 ..........................................................................12, 28

14 C.F.R. § 302.38 ....................................................................12, 28, 29

14 C.F.R. § 302.404 .............................................................................11

14 C.F.R. § 399.40 ...............................................................................22

Additional Guidance on Airfare/Air Tour Price Advertisements,
    77 Fed. Reg. 11,618, 11,619 (Feb. 27, 2012) ...................................45

Exemption From Passenger Tariff-Filing Requirements in Certain
    Instances, 62 Fed. Reg. 10,758 (Mar. 10, 1997)..........................*passim*

Exemptions From Passenger Tariff-Filing Requirements in Certain
    Instances, 64 Fed. Reg. 40,654 (July 27, 1999)..........................*passim*

H.R. Conf. Rep. No. 104-458, *reprinted in* 1996 U.S.C.C.A.N. 124......................31

Notice of Disclosure, 69 Fed. Reg. 65,676, 65,677 (Nov. 15, 2004) ....42, 45, 46, 47

Tariffs for Post-1982 Domestic Travel,
47 Fed. Reg. 14,892 (Apr. 7, 1982) ...................................................................22

# INTRODUCTION

The filed rate doctrine prevents antitrust plaintiffs from asking the judiciary, under the guise of an antitrust damages action, to set aside rates overseen by a regulatory agency. Where rate-setting authority has been vested in an expert administrative agency, the filed rate doctrine applies broadly to bar antitrust damages claims based on any rates within the agency's jurisdiction. In other words, it is a doctrine based on principles of separation of powers and agency expertise that funnels rate challenges to the agency charged with overseeing the rates.

Because the filed rate doctrine requires the courts to defer to administrative agencies, its application does not depend on the precise manner in which the expert agency has chosen to regulate rates. The filed rate doctrine therefore applies not only to rates that are literally filed with the agency, but also to *un*filed, market-based rates that are nonetheless subject to the agency's jurisdiction. So long as the agency maintains authority to review rates in the marketplace, the rates are deemed reasonable as a matter of law and cannot be challenged in an antitrust damages action.

In this putative class action, plaintiffs seek antitrust damages from the defendant foreign-based airlines, alleging that they charged excessive fuel surcharges and passenger fares on air travel between the United States and

1

Asia/Oceania. The defendant airlines are all overseen by the U.S. Department of Transportation ("DOT"), an agency with congressional authority to regulate many facets of international air travel.

Congress has vested DOT with authority to ensure that all international air fares and charges are just and reasonable. True to this mandate, DOT has long regulated international airline pricing. While DOT no longer requires airlines to file all of their international fares, it continues to regulate the rates they charge. Among other things, DOT has established a robust complaint process that allows both consumers and competitors to challenge the lawfulness of international airline rates and charges. Because DOT has consistently asserted and exercised its jurisdiction over international airline pricing, the filed rate doctrine bars plaintiffs' antitrust damages claims.

In the decision below, the district court correctly recognized that Congress broadly and unequivocally vested DOT with authority over international air fares and surcharges. The court, however, refused to defer to the prices charged under DOT's watch based on its conclusion that DOT had "effectively abdicated" its regulatory authority over fuel surcharges and unfiled rates.

That decision represents the first time any federal court has ever found that an agency had "effectively abdicated" its congressional mandate to regulate rates. It is also the only time a court has ever found "abdication" where the agency

2

explicitly stated that it was maintaining its authority, continued to demand filing of many rates, and continued to engage in regulatory activity. The district court's answer to these points—that DOT's regulatory efforts were insufficiently active—is precisely the kind of judicial second-guessing that the filed rate doctrine is intended to prevent.

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction pursuant to 28 U.S.C. § 1331. On November 3, 2014, the district court certified for interlocutory appeal its order denying in part defendants' motions for summary judgment based on the filed rate doctrine. ER95-ER96. Defendants filed a timely petition for permission to appeal on November 14, 2014. ER34-ER66. This Court granted the petition on February 27, 2015. ER32-ER33. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1292(b).

## ISSUES PRESENTED

1. Where DOT extensively regulated rates and affirmatively asserted authority over unfiled rates, did the district court err in holding that DOT "effectively abdicated" its statutory authority over such rates?

2. Where DOT extensively regulated fuel surcharges and directed airlines that all surcharges were to be filed with DOT, did the district court err in holding that the filed rate doctrine does not apply to fuel surcharges?

3

3.     Where rates were filed with and approved by overseas aviation authorities pursuant to foreign regulatory requirements, and where DOT permitted those rates to be charged, do principles of agency deference and international comity require application of the filed rate doctrine to those rates?

## STATEMENT OF THE CASE

### A.     The Filed Rate Doctrine

The filed rate doctrine bars all claims for damages, including private antitrust actions, that challenge rates authorized by a government agency.  The doctrine originated with *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156 (1922), where the Supreme Court held that an antitrust plaintiff could not recover damages caused by allegedly anticompetitive transportation rates because the challenged rates had been filed with the Interstate Commerce Commission.  *Id.* at 165.

A central rationale for the filed rate doctrine is "deference to federal agency expertise."  *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 867-68 (9th Cir. 2013). The doctrine is a specific application of the general principle that where "there is an express delegation of authority" to an administrative agency, courts must give agency decisions "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Chevron USA v. Natural Res. Def. Council*, 467 U.S. 837, 843-44 (1984).

Rate-making is a "highly technical" process, *E. Ky. Power Co-op v. FERC*, 489 F.3d 1299, 1306 (D.C. Cir. 2007), and involves policy considerations beyond the expertise of courts, *Time Warner Entm't Co. v. FCC*, 56 F.3d 151, 163 (D.C. Cir. 1995); *see also Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 21 (2d Cir. 1994) ("As compared with the expertise of regulating agencies, courts do not approach the same level of institutional competence to ascertain reasonable rates."). Thus, where rate-making authority is delegated to an administrative agency, the filed rate doctrine precludes "the unnecessary interjection of the courts into the rate-making process where they have no expertise or valid reason to interfere." *Carlin*, 705 F.3d at 868; *see Wegoland*, 27 F.3d at 21 (filed rate doctrine places rate regulation in the hands of agencies "deeply familiar with the workings of the regulated industry"). The doctrine also "foster[s] stability" for industry participants by ensuring that an agency will not authorize a rate, only to have the same rate later attacked in the courts. *Wegoland*, 27 F.3d at 21.

Consistent with the Supreme Court's admonition that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer," *Chevron*, 467 U.S. at 844, the filed rate doctrine "has been given an expansive reading and application in this Circuit." *Carlin*, 705 F.3d at 868. This Court has held that an agency with rate-setting authority should be given "wide latitude to determine the most effective way to

carry out its charge from Congress." *E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1039-43 (9th Cir. 2007). This "wide latitude" means that judicial damages claims are foreclosed regardless of the specific rate-filing and review mechanisms the agency decides to employ. Because deference to agency authority and expertise is the driving rationale for the filed rate doctrine, the dispositive question is whether a rate is within an agency's jurisdiction, not the particular means by which the agency regulates that rate. *See Carlin*, 705 F.3d at 870 (the "essential question was whether the market rates were *authorized*" by the agency).

For these reasons, the filed rate doctrine applies when an agency chooses to wield its rate regulation authority with a "light hand," *Gallo*, 503 F.3d at 1042, or where there is no "meaningful agency review" of rates, *Carlin*, 705 F.3d at 872. *See also Square D Co. v. Niagara Frontier Tariff Bureau*, 476 U.S. 409, 417 & n.19 (1986) (doctrine not limited to cases where "'rates had been investigated and approved'" by agency); *Wah Chang v. Duke Energy Trading & Mktg.*, 507 F.3d 1222, 1227 (9th Cir. 2007) ("laxness does not indicate, much less establish, that [a plaintiff] can turn directly to the courts for rate relief"). The doctrine also applies to "market-based" rates, where an agency has exempted regulated entities from literally filing certain prices, so long as those rates remain within the agency's jurisdiction. *Gallo*, 503 F.3d at 1038-42; *Pub. Util. Dist. No. 1 of Snohomish Cnty.*

*v. Dynegy Power Mktg.*, 384 F.3d 756, 760-62 (9th Cir. 2004); *Pub. Util. Dist. No. 1. of Grays Harbor Cnty. v. IDACORP Inc.*, 379 F.3d 641, 651-52 (9th Cir. 2004).

### B.  Regulation Of Rates For International Air Travel

Congress has granted DOT broad authority over the pricing of international passenger air travel.  By statute, airlines must establish "reasonable prices . . . related to foreign air transportation."  49 U.S.C. § 41501.  DOT is charged with enforcing that requirement as part of its mandate to prevent "unfair, deceptive, predatory, or anticompetitive practices in air transportation."  *Id.* § 40101(a)(9). Among its powers, DOT has broad authority to approve or disapprove rates.  *Id.* § 41504.

This regulatory structure was established by the Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731 (1958), continuing a regulatory model that dated back to the New Deal.  In 1978, Congress largely disbanded this regulatory structure for *domestic* air transportation when it deregulated air travel within the United States.  Airline Deregulation Act, Pub. L. No. 95-504, 92 Stat. 1705 (1978). However, Congress explicitly chose a different path for *international* air travel.  In the International Air Transportation and Competition Act of 1979 ("IATCA"), Congress sought to "promote competition in international air transportation," while nonetheless maintaining international air travel as a regulated industry.  Pub. L. No. 96-192, § 2, 94 Stat. 35, 36 (1980).

7

The IATCA placed supervision of international air transportation rates under the regulatory control of DOT. Consistent with its broad grant of authority, Congress has provided DOT with flexibility regarding how best to regulate international airline pricing. The default rule remains that (i) all airlines engaging in foreign air transportation must file tariffs setting forth rates in advance of their effective date, and (ii) DOT may reject any proposed rate, which renders the rate void. 49 U.S.C. §§ 41504, 41509. However, DOT has the authority to exempt carriers from filing tariffs to "the extent [DOT] considers necessary," so long as its actions are "consistent with the public interest." *Id.* § 40109(c). Regardless of whether a rate has been filed, DOT retains the authority to reject an unreasonable or discriminatory rate. *Id.* §§ 41507, 41509; ER169 (Exemption From Passenger Tariff-Filing Requirements in Certain Instances, 62 Fed. Reg. 10,758, 10,763 (Mar. 10, 1997)).

For the first twenty years after the IATCA was enacted, DOT chose to maintain the regulatory status quo: it required that *all* international prices be filed. ER17. In 1999, DOT determined that its regulatory goals would be better met by establishing a new and more selective rate-filing regime. *See* ER199 (Exemptions From Passenger Tariff-Filing Requirements in Certain Instances, 64 Fed. Reg. 40,654, 40,654 (July 27, 1999)).

8

The new filing regime segmented rates into three categories: (1) rates for flights to "Category A" countries, which did not need to be filed; (2) rates to "Category B" countries, which needed to be filed if they were unrestricted one-way economy fares; and (3) rates to "Category C" countries, which were required to be filed as before. *Id.* Even where flights operated by some carriers are placed in a particular category, DOT may require tariff filings for "some or all of their services" when competitive conditions warrant. 14 C.F.R. § 293.10(c).

DOT was explicit that the new filing regime "will not materially lessen the Department's ability to intervene in passenger pricing matters." ER169 (62 Fed. Reg. at 10,763). Rather, the new regulations reflected DOT's view that "alternative methods existed for protecting consumers" that would be even "more effective than filed tariffs." ER199 (64 Fed. Reg. at 40,654). DOT emphasized that it still had "statutory authority to take action directly against unfiled passenger fares and rules under a variety of circumstances" and could "reinstat[e] the tariff-filing obligation" at any time. ER169 (62 Fed. Reg. at 10,763). DOT also made clear that it could move countries to different filing categories in its discretion. 14 C.F.R. § 293.10(b).

True to this promise, DOT has continually revised the list of countries in each filing category, issuing five such lists between 1999 and 2012. ER693, ER696-ER756. These actions moved some countries to less restrictive filing

9

categories and moved at least one country to a more restrictive category.  ER712 (changing Argentina from Category A to Category B).  In tailoring these country-by-country filing requirements, DOT considered the actions of foreign aviation authorities who required that many of the relevant rates also be filed with overseas regulators.  ER201(64 Fed. Reg. at 40,656), ER166 (62 Fed. Reg. at 10,760).

Throughout the class period, DOT has reviewed rate filings, disapproving certain rates and extensively questioning the need for others.  ER405-ER406, ER415-ER416, ER226-ER233, ER422.

## C.  Regulation Of Fuel Surcharges

Fuel surcharges, which are additional per-ticket fees based on the increased price of fuel to airlines, are a special type of rate governed by DOT.  These surcharges fall within DOT's statutory jurisdiction over "prices" for all international passenger flights.  49 U.S.C. § 40102(a)(39) (defining "price" to include any "rate, fare or charge").  Like other rates for international air travel, surcharges are subject to DOT's filing requirements.  *Id.* § 41504(a) ("every air carrier and foreign air carrier shall file with the Secretary, publish, and keep open to public inspection, tariffs showing the prices for foreign air transportation").

In 1999, when DOT modified its filing regime to create the tiered filing system, it required that certain types of rates "continue to be filed" under all circumstances.  ER698-ER699; *see also* ER705 ("elimination of our tariff filing

requirements for certain information should not be construed as a grant of exemption from other requirements of our regulations"). Fuel surcharges were among these rates: DOT explicitly mandated that "all surcharges are to be filed." ER707. At no time did DOT ever rescind or alter this requirement.

### D.    DOT Complaint Process

When DOT announced its tiered rate-filing regime, it noted that in the absence of routine tariff filings for certain routes, it would "rely primarily upon competitors and users to bring any problems to [its] attention." ER169 (62 Fed. Reg. at 10,763 n.13). One important way in which DOT monitors fares and charges is through its congressionally mandated complaint process. *See* 49 U.S.C. § 46101 (stating that a "person may file a complaint in writing with the Secretary of Transportation" and requiring DOT to investigate all potentially meritorious complaints).

DOT regulations permit "any person" to file a complaint about any violation of DOT "rules, regulations, orders or other requirements," 14 C.F.R. § 302.404, and to challenge the "lawfulness of rates, fares, or charges for . . . foreign air transportation," *id.* § 302.502. When a complaint is filed, or on its own initiative, DOT "may issue an order instituting an investigation of the lawfulness of any present or proposed rates, fares, or charges." *Id.* § 302.505.

11

In investigating a complaint, DOT may appoint an administrative law judge, issue subpoenas, order that depositions be taken, hold hearings at which witnesses are examined, and hear oral argument. *See generally* 14 C.F.R. §§ 302.17-302.38. After completing its investigation, DOT must issue a final order explaining the reasons for its conclusion about the lawfulness of the rate. *Id.* § 302.38; *see also* 49 U.S.C. § 41509(a) (authorizing DOT to reject any price determined to be "unreasonable," "unreasonably discriminatory," or not in the "public interest").

DOT has used its complaint process to adjudicate challenges to international airline pricing, including challenges to fuel surcharges. For example, in 2012, a consumer filed a complaint and request for investigation against Delta and other airlines challenging, among other things, the "lawfulness of the $250 international change fee" as contrary to the "legal mandate of a 'reasonable' charge for a change penalty." ER194. DOT has also adjudicated consumer complaints against American Airlines, Cathay Pacific, and British Airways regarding their fuel surcharges. ER292-ER307, ER100-ER106.

### E. Proceedings In The District Court

In 2007, plaintiffs brought a putative antitrust class action alleging that defendants conspired to fix the price of international passenger fares and fuel surcharges on flights from the United States to Asia/Oceania. ER472. Plaintiffs purport to represent a class comprised of all "persons and entities that purchased

passenger air transportation" for travel "between the United States and Asia or Oceania . . . at any time between January 1, 2000 and the present." ER596.

In 2013, defendants moved for summary judgment based on the filed rate doctrine. The district court granted the motion in part and denied it in part. ER1.

The district court recognized "that Congress gave [DOT] authority over *all* of the rates and charges at issue in this case," irrespective of whether the rates were actually filed. *Id.* (emphasis added). In doing so, the court rejected plaintiffs' categorical argument that Congress "deregulated the airline industry and did not intend for the filed rate doctrine" to apply here. ER15.

With respect to fares that DOT required airlines to file, such as Category C air fares, the district court held that the filed rate doctrine applied. As the court noted, Congress "reaffirmed" DOT's jurisdiction over these rates when it enacted the IATCA. ER17 (citing Pub. L. No. 96-192, § 14, 94 Stat. at 40-42) (explaining that DOT could, among other things, "suspend the operation of such tariff and defer the use of such rate"). The court further observed that DOT sometimes took the affirmative step of "approving the filed rates" by marking them "Approved" in the electronic filing system used to supply the rates to DOT. ER18-ER19; *see also* ER694-ER695, ER428, ER238. The district court thus concluded that the filed rate doctrine barred plaintiffs' challenges to any fares that had been actually filed with

13

DOT, reasoning that it was "not at liberty to question a federal agency's discretion in rate-making."  ER19 (citing *Gallo*, 503 F.3d at 1039).

The district court, however, reached a different conclusion with respect to *unfiled*, market-based rates.  The district court recognized that whether a rate is literally filed "is not determinative of whether the filed rate doctrine applies." ER20-ER21 (citing *Gallo*, 503 F.3d at 1040, 1042).  It also acknowledged that DOT (i) had put in place a complaint process allowing passengers to challenge the reasonableness of international airline pricing, and (ii) affirmatively re-asserted its continued regulatory authority over unfiled rates when it announced its tiered filing regime in the late 1990s.  ER20, ER23-ER24.  The district court nevertheless held that DOT had "effectively abdicated" its authority over unfiled rates based on its conclusion that DOT was not "doing enough" regulation.  ER20 (quotation marks omitted).

The district court also held that DOT had abdicated its authority over fuel surcharges.  The court acknowledged that DOT had jurisdiction over fuel surcharges, but concluded that DOT was not exercising sufficient oversight over fuel surcharges to warrant application of the filed rate doctrine.  ER25.  While the district court acknowledged DOT's 1999 mandate that "all surcharges are to be filed," it concluded that this requirement was implicitly rescinded by later DOT

14

pronouncements regarding fuel surcharges. *Id.* On that basis, the court refused to apply its holding regarding filed fares to the fuel surcharges at issue in this case.

In a brief footnote, the district court also refused to apply the filed rate doctrine to rates filed with and approved by foreign regulators. ER24 n.33. Without any analysis or citation to authority, the district court concluded that the reasons "a court would defer to a federal agency's decision . . . do not apply to foreign regulators." *Id.*

At defendants' request, the district court certified its order partially denying defendants' summary judgment motion for interlocutory appeal, ER95-ER96, which this Court granted, ER32-ER33.

## SUMMARY OF THE ARGUMENT

The filed rate doctrine has long barred antitrust damages claims based on rates that are regulated by an executive agency. The doctrine is rooted in the familiar principle that where Congress has entrusted a matter to agency discretion, the courts are required to defer to the agency even if a particular court might have regulated differently.

The purpose of the filed rate doctrine is to preserve the power of expert administrative agencies to oversee the rates under their jurisdiction. In light of the wide latitude that agencies have in determining how best to regulate rates, agencies are entitled to deference even where they regulate with a light hand or do not

meaningfully review rates. Indeed, this Court has recognized that the filed rate doctrine bars antitrust damages claims even if an agency exempts an industry from rate-filing altogether, so long as the agency maintains jurisdiction.

Here, Congress vested DOT with the exclusive authority to regulate pricing for international passenger air travel. While Congress deregulated the *domestic* airline industry in the late 1970s, it made a different decision with respect to *international* aviation. Thus, DOT retains the power to require airlines to file tariffs for international flights and can disapprove any fare or charge that it determines to be unreasonable or contrary to the public interest.

While Congress gave DOT the authority to exempt carriers from tariff-filing requirements in 1979, DOT continued to require all international airline prices to be filed for 20 years. After careful study and analysis, DOT decided in 1999 to exempt some, but not all, fares from filing. In doing so, DOT made clear that it was merely choosing an alternative and more effective mode of regulation and that it would reinstate filing requirements if necessary to protect consumers.

The district court correctly recognized that DOT has statutory authority to regulate all of the fares and charges at issue in this litigation. It also correctly held that the filed rate doctrine bars plaintiffs' claims regarding rates that DOT required to be filed. However, it refused to apply the doctrine to fuel surcharges and unfiled fares based on its conclusion that DOT had "effectively abdicated" its authority

16

over those fares and charges. This Court should reverse the district court's unprecedented finding of abdication by DOT.

1. The district court's conclusion that DOT "abdicated" its authority over unfiled rates was contrary to decisions of this Court giving an expansive application to the filed rate doctrine. If allowed to stand, the district court's decision would have the upside-down effect of applying the greatest amount of judicial scrutiny to the very rates that the expert agency determined were least in need of oversight. For at least three reasons, the district court erred.

*First*, this Court has repeatedly upheld application of the filed rate doctrine even where an agency has determined to exempt *all* rates from filing and to rely solely on the market to set rates. Here, DOT made the considered decision to exempt only *some* rates from filing, after performing a country-by-country analysis, and it has continued to review and adjust its tiered filing regime since 1999. DOT's regulatory activity is amply sufficient under this Court's decisions applying the filed rate doctrine to market-based rates.

*Second*, DOT affirmatively asserted that it would continue to monitor and supervise unfiled rates. DOT's interpretation of its own regulation—which was published in the Federal Register and never rescinded—is entitled to deference from the courts. The district court's finding of abdication is in conflict with DOT's express statements to the contrary.

17

*Third*, DOT has regulated unfiled rates, among other ways, through a robust complaint process. Under established law, the existence of a complaint process enabling consumers to challenge rates, standing alone, mandates application of the filed rate doctrine. Here, moreover, the record reflects that DOT's complaint process has been used by consumers to challenge rates and fuel surcharges. Accordingly, DOT has not abdicated its authority over unfiled rates.

2. The filed rate doctrine also bars plaintiffs' damages claims relating to fuel surcharges. As the district court recognized, the doctrine applies to rates that are required to be filed. Here, DOT unambiguously instructed airlines in 1999 that "all surcharges are to be filed." While the district court apparently concluded that a 2004 DOT announcement implicitly withdrew this requirement for fuel surcharges, that interpretation is baseless. The 2004 announcement related only to the technical mechanisms by which airlines could meet their ongoing surcharge filing obligations. Because DOT has at all relevant times required fuel surcharges to be filed, the filed rate doctrine applies to those surcharges.

The district court's decision was also wrong for another, independent reason: DOT did not abdicate its authority over fuel surcharges. As with unfiled fares, DOT regulates fuel surcharges, *inter alia*, through a complaint process. Requests by carriers to impose fuel surcharges, moreover, have received considerable scrutiny from DOT, which among other things has required that surcharges reflect

18

actual fuel costs and has regulated fuel surcharges through its authority over airline advertising.  Accordingly, the filed rate doctrine bars plaintiffs' requests for damages based on fuel surcharges.

3.      Finally, the filed rate doctrine bars damages claims based on rates that were filed with and approved by regulators in Hong Kong, Japan, and the Philippines.

The filed rate doctrine is premised on the fact that expert agencies, and not the courts, are best suited to regulate rates.  That principle applies with full force whether the agency is foreign or domestic.  Contrary to the district court's suggestion that the doctrine is limited to rates regulated by federal agencies, the courts have applied the doctrine where rates were filed with and approved by non-federal agencies.

Principles of foreign comity and separation of powers further support application of the doctrine to foreign-filed rates.  Regulating international air travel necessarily requires cooperation and mutual agreement between governments: a foreign government could not regulate the pricing of flights to and from the United States without at least the implicit approval of the U.S. government.  In regulating international aviation, moreover, Congress has delegated to DOT responsibility for coordinating with foreign governments.  Permitting the judicial second-guessing of rates that have been approved by foreign regulators—with the full knowledge and

tacit approval of DOT—would upset the delicate balance that DOT has struck with multiple foreign nations and improperly insert the judiciary into foreign policy matters within the special capabilities of the executive branch.

## STANDARD OF REVIEW

This Court reviews de novo the district court's partial denial of summary judgment and its analysis of the filed rate doctrine. *Gallo*, 503 F.3d at 1033.

## ARGUMENT

### I. The Filed Rate Doctrine Applies To All Rates For International Air Travel, Whether Or Not They Were Filed.

The filed rate doctrine applies whenever "Congress has given a federal agency authority to set rates under a federal statute and the agency has exercised that authority." *Carlin*, 705 F.3d at 869. This Court, moreover, has repeatedly applied the doctrine to "market-based rates" that are not filed with the agency at all. *See, e.g.*, *Gallo*, 503 F.3d at 1039.[1] Here, the doctrine bars plaintiffs' challenges to rates for international air travel—irrespective of whether they were literally filed—because DOT has jurisdiction over those rates and actively regulates them.

While the district court correctly recognized that Congress has granted DOT authority over international airline pricing, it wrongly concluded that DOT has

---

[1] *See also Wah Chang*, 507 F.3d at 1224-26 (filed rate doctrine applies to "tariffs approved by [agency] under its market-based rate-setting approach"); *Snohomish Cnty.*, 384 F.3d at 760-62 (same); *Grays Harbor*, 379 F.3d at 651-52 (same).

"abdicated" that authority. The district court's decision was unprecedented: it represents the first and only time that a court has refused to apply the filed rate doctrine based on its belief that an expert agency was not "doing enough" regulating to warrant application of the doctrine. In so holding, the district court failed to afford appropriate deference to DOT and improperly "usurped a function that Congress has assigned to a federal regulatory body." *Ark.-La. Gas Co. v. Hall*, 453 U.S. 571, 582 (1981).

### A. Congress Granted DOT Authority Over Unfiled Prices.

Plaintiffs' challenge to unfiled prices is barred by the filed rate doctrine because Congress granted DOT authority over all international transportation rates, whether filed or not. *See Carlin*, 705 F.3d at 869 (doctrine applies when "Congress has given a federal agency authority to set rates under a federal statute").

Congress charged DOT with "preventing unfair, deceptive, predatory, or anticompetitive practices in air transportation." 49 U.S.C. § 40101. As part of this mandate, DOT must ensure that each carrier establishes "reasonable prices . . . related to foreign air transportation." *Id.* § 41501(1); *see also id.* § 40102(a)(39) (defining price to include any "rate, fare, or charge"). DOT's powers include the ability to suspend, cancel, or reject any price that an airline wishes to charge for foreign air travel. *Id.* § 41509. In deciding whether to approve or reject a rate,

DOT considers multiple factors bearing on the reasonableness of the rate, including the "reasonably estimated or foreseeable future costs and revenues," the "effect of the price on the movement of traffic," and "whether the price will be predatory or tend to monopolize competition among air carriers." *Id.* Thus, as the district court recognized, DOT has clear statutory authority over the rates at issue in this case. ER15-ER16.

Had Congress wanted to remove DOT's authority over international air prices, it knew how to do so. Indeed, Congress did remove federal regulatory control over pricing for *domestic* air travel in the Airline Deregulation Act. *See* 14 C.F.R. § 399.40; Tariffs for Post-1982 Domestic Travel, 47 Fed. Reg. 14,892 (Apr. 7, 1982). But Congress took a different tack with respect to international pricing. Congress did not eliminate filing requirements for international flights. 49 U.S.C. § 41504(a) (requiring carriers to "publish, and keep open to public inspection, tariffs showing the prices for . . . foreign air transportation"). To the contrary, Congress reaffirmed DOT's jurisdiction over pricing for international air travel. Pub. L. No. 96-192; *see also* 49 U.S.C. §§ 41504(c), 41509; ER17 ("far from removing the DOT's jurisdiction over filed rates, Congress reaffirmed it"). Therefore, Congress granted DOT jurisdiction over the unfiled rates in this case.

## B. DOT Exercised Its Regulatory Authority Over Unfiled Rates.

Consistent with its charge from Congress, DOT has extensively regulated the unfiled fares and charges at issue in this case. As demonstrated below, DOT exercised its oversight, *inter alia*, by (i) implementing, monitoring and updating a tiered rate-filing regime, (ii) expressly asserting its authority over unfiled air fares, and (iii) utilizing a complaint process that empowers DOT to assess whether unfiled rates are lawful and reasonable. These actions amply demonstrate that DOT has "exercised [its] authority" over unfiled rates. *Carlin*, 705 F.3d at 869.

### 1. DOT created and maintained a rate-filing regime.

The regulatory regime enacted by DOT demonstrates its continued authority over pricing for international air transportation. Perhaps the best illustration is that DOT continued to require that all rates be filed for twenty years after the passage of IATCA. Moreover, even when it moved away from a regime of comprehensive rate-filing, DOT demonstrated its ongoing oversight of pricing by implementing a tiered filing system after considerable deliberation—and by repeatedly refining that system over the years.

When DOT determined to exempt certain rates from filing in the late 1990s, it did not detariff the whole industry, but instead determined, after notice-and-comment rulemaking, that it would "selectively exempt carriers" from filing requirements. ER166 (Exemption From Passenger Tariff-Filing Requirements in

Certain Instances, 62 Fed. Reg. 10,758, 10,760 (Mar. 10, 1997)).  DOT created

three filing categories: Carriers flying to Category A countries did not need to file

tariffs, those flying to Category B countries had to file unrestricted one-way

economy fares, and those flying to Category C countries had to file all fares.  *Id.*;

*see also* 14 C.F.R. § 293.10.

When this regulation went into effect in 1999, DOT first determined, for

every country in the world, which filing category would apply—A, B, or C.

ER697-ER704.  DOT continuously monitors and revises this list; it has issued four

subsequent notices that changed the filing categories for certain countries.  ER711-

ER756.  As part of these revisions, DOT imposed stricter filing requirements for

Argentina in 2005.  ER712.  These actions demonstrate that DOT was carefully

assessing the filing requirements that should apply to each country, not engaging in

blanket deregulation.[2]  DOT's actions are analogous to agency actions in other

cases where this Court has applied the filed rate doctrine to market-based rates.

*E.g.*, *Gallo*, 503 F.3d at 1039-43 (applying filed rate doctrine to market-based

energy rates); *Wah Chang*, 507 F.3d at 1225-27 (same); *Snohomish Cnty.*, 384 F.3d

at 760-62 (same); *Grays Harbor*, 379 F.3d at 651-52 (same).

---

[2]  DOT in fact voided several prices that airlines sought to charge on flights during
the relevant time period.  ER405-ER406, ER415-ER416, ER226-ER233, ER422.

DOT's gradual adoption of some market-based rates most closely parallels the phased adoption of market-based natural gas rates in *Gallo*. There, the Federal Energy Regulatory Commission ("FERC") started "moving toward market-based rates" by allowing interstate pipelines to sell gas "at market-based rates rather than at rates filed with FERC." *Gallo*, 503 F.3d at 1038. FERC subsequently allowed *all* sellers subject to its jurisdiction to use market-based rates. *Id.* at 1038 & n.10. FERC even referred to its activities as "'light-handed regulation.'" *Id.* at 1042 (quoting 57 Fed. Reg. 13,267, 13,297 n.220 (Apr. 16, 1992)). This Court nevertheless applied the filed rate doctrine, holding that FERC "has acted, albeit with a light hand, to authorize just and reasonable rates in the natural gas arena." *Id.*

A straightforward application of *Gallo* makes clear that DOT's gradual and considered adoption of some market-based fares is entitled to deference. Here, as in *Gallo*, DOT started from a baseline of requiring every rate to be filed. Here, as in *Gallo*, DOT slowly and deliberately adopted a complex filing system that replaced some filed rates with market-based prices. Here, as in *Gallo*, DOT assessed the competitive market and tailored filing requirements accordingly. *See* ER166 (62 Fed. Reg. at 10,760). Here, as in *Gallo*, DOT's refinement of its rate-filing structure demonstrates its ongoing oversight over the industry and reinforces the need for judicial deference. Moreover, this case presents an even more

compelling case for application of the filed rate doctrine because, unlike in *Gallo*, (i) DOT has maintained a filing regime for many rates; (ii) DOT waited twenty years to exempt any rates from filing, compared to about three years in *Gallo*; and (iii) DOT strengthened filing requirements for flights to at least one country (Argentina), while FERC did not reinstate any filing requirements until after the 2000-2001 energy crisis. *See Gallo*, 503 F.3d at 1038.

DOT's regulation of unfiled rates also exceeds the regulation of shipping rates that this Court considered in *In re Hawaiian & Guamanian Cabotage Antitrust Litigation* ("*Cabotage II*"), 450 F. App'x 685 (9th Cir. 2011). There, the Court affirmed application of the filed rate doctrine to a regulatory regime involving a mix of filed and unfiled rates. *Id.* The district court applied the filed rate doctrine even though the plaintiffs argued that the regulating board did "not engage in antecedent review or post-filing approval of tariffs." *In re Hawaiian & Guamanian Cabotage Antitrust Litig.* ("*Cabotage I*"), 754 F. Supp. 2d 1239, 1247 (W.D. Wash. 2010). The court held that these facts were irrelevant so long as the charges at issue fell within the board's jurisdiction. *Id.* ("plaintiffs still do not, nor can they, assert that the [board] lacks authority to review the fuel surcharges at issue"); *see also Cabotage II*, 450 Fed. App'x at 688 (board did not abdicate its authority). *Cabotage* is squarely on point here, where DOT continues to assert plenary authority over all rates and requires some but not all rates to be filed.

26

## 2. DOT explicitly asserted its regulatory authority.

DOT's own statements confirm beyond question that it regulates unfiled air fares. When DOT proposed in 1997 to exempt certain rates from filing requirements, it stated in clear terms that the rule would "not materially lessen the Department's ability to intervene in passenger pricing matters should it be necessary." ER169 (62 Fed. Reg. at 10,763). DOT reiterated that it would "take action directly against unfiled passenger fares and rules under a variety of circumstances." *Id.* DOT also "reserve[d] the option" of "reinstating the tariff-filing obligation" for particular markets or carriers. *Id.*

By stating its intent to continue regulating, DOT made clear that it was not abdicating its rate-making authority. In applying the filed rate doctrine, this Court has "relied on [an agency's] assertions that it was continuing to exercise its authority." *Gallo*, 503 F.3d at 1041 (citing *Grays Harbor*, 379 F.3d at 651). Indeed, an agency's interpretation of its own regulation is "controlling" unless "'plainly erroneous.'" *Bassiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). Accordingly, the Court should defer to DOT's express assertion that it continues to oversee unfiled rates for international air travel.

### 3. DOT created and used a robust complaint process.

The existence of a robust complaint process permitting challenges to the reasonableness of international airline pricing further demonstrates that DOT continues to regulate unfiled fares.

In *Gallo*, this Court held that FERC maintained ongoing oversight of the natural gas market even after eliminating *all* rate-filing requirements, largely because FERC advised that "it would continue to 'monitor the operation of the market through the complaint process.'" 503 F.3d at 1038 (quoting 57 Fed. Reg. at 57,958). In *Cabotage II*, the filed rate doctrine barred the plaintiffs' damages claims because there was "nothing to suggest that those aggrieved are unable to challenge the underlying rates . . . through a complaint process." 450 F. App'x at 689.

Here, when DOT announced its tiered rate-filing regime in 1997, it indicated that it would rely in part on airline customers and competitors to bring problems regarding unfiled prices to its attention. *See* ER169 (62 Fed. Reg. at 10,763 n.13). One way in which customers may bring potential problems to DOT's attention is through its complaint process. DOT has adopted extensive regulations governing its complaint process, providing for subpoenas, depositions, evidentiary hearings, and oral argument. *See generally* 14 C.F.R. §§ 302.505, 302.17-302.38. After completing its review, DOT must issue an order rejecting any rate that it

28

determines to be "unreasonable," "unreasonably discriminatory," or not in the "public interest." 49 U.S.C. § 41509(a); *see* 14 C.F.R. § 302.38.

The undisputed evidence, moreover, shows that this complaint process has been used by consumers to challenge rates. Plaintiffs' own expert admitted that DOT received and adjudicated complaints about pricing, including complaints about fuel surcharges. ER189-ER191, ER292-ER307. DOT's use of the complaint process further demonstrates that it actively regulates international airline prices, and therefore that the filed rate doctrine bars plaintiffs' challenges to unfiled rates.

### C. DOT Did Not Abdicate Its Authority Over Unfiled Rates.

Despite recognizing that DOT has statutory authority over unfiled rates and the extensive regulatory activities discussed above, the district court refused to apply the filed rate doctrine to unfiled rates based on its conclusion that DOT had "effectively abdicated" its authority over those rates. ER19. The district court was mistaken.

The purpose of the filed rate doctrine is to preserve "the exclusive role of the regulatory agencies" in overseeing rates in regulated industries. *Wah Chang*, 507 F.3d at 1226. Accordingly, expert agencies are entitled to deference even when they regulate with a "light hand," *Gallo*, 503 F.3d at 1042, or fail to conduct a "meaningful review" of rates, *Carlin*, 705 F.3d at 871. These decisions recognize

29

that an empowered agency has "wide latitude to determine the most effective way to carry out its charge from Congress," regardless of the precise manner in which the agency chooses to regulate rates. *Gallo*, 503 F.3d at 1039.

To be sure, this Court has recognized an exception to the filed rate doctrine in the rare circumstance where an agency has "effectively abdicated its rate-making authority." *Id.* at 1040. However, given the "wide latitude" afforded to expert agencies, the abdication exception is a narrow one. Until the decision below, no federal court had ever refused to apply the filed rate doctrine based on a finding that the regulator had "effectively abdicated" its congressional authority. And courts have recognized in other cases involving review of agency decisions that an "abdication" finding is an "extreme" step. *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985) (quotation marks omitted); *see also Riverkeeper, Inc. v. Collins*, 359 F.3d 156, 170 n.17 (2d Cir. 2004) (noting that no court of appeals "has found, in performing the *Chaney* analysis, a federal agency to have abdicated its statutory duties").

Here, DOT's efforts fall squarely within the "wide latitude" afforded to it by Congress in regulating international airline pricing. For the reasons explained below, the Court should reject the district court's unprecedented conclusion that DOT "effectively abdicated" its authority over unfiled rates.

### 1. DOT did not renounce its authority over rates at the encouragement of Congress.

The decision below relied in part on this Court's decision in *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003), to support its abdication finding. But, as the district court itself recognized, *Ting* involved a complete and utter abandonment of regulatory responsibility—at the encouragement of Congress—that was a "far cry" from this case. ER17.

In *Ting*, which is not couched in terms of agency "abdication," this Court relied upon the interaction of congressional and agency action in holding that the filed rate doctrine did not apply. 319 F.3d at 1142. *Ting* concerned a fifteen-year effort by the Federal Communications Commission ("FCC") to eliminate filing requirements for certain telecommunications rates. *Id.* at 1131-32. Although FCC believed that the rates should not be regulated *at all*, it was prohibited by statute from eliminating the rate-filing requirement. *Id.*

In 1996, Congress passed the Telecommunications Act, which "fundamentally altered the [prior] regulatory scheme." *Id.* at 1132. Congress embraced FCC's detariffing rationale, stating that the purpose of the act was to provide for a "de-regulatory national policy framework" for the telecommunications industry. H.R. Conf. Rep. No. 104-458, at 113, *reprinted in* 1996 U.S.C.C.A.N. 124; *see also Ting*, 319 F.3d at 1132. Congress not only allowed FCC to exempt telecommunications companies from filing rates, but

31

actively encouraged FCC to "forbear from applying any regulation" that it determined to be unnecessary. 47 U.S.C. § 160(a)(1); *see also Ting*, 319 F.3d at 1132.

Once empowered by Congress, FCC swiftly renounced its authority over rates, prohibiting carriers from filing any tariffs whatsoever. *Ting*, 319 F.3d at 1132. Importantly, FCC affirmatively indicated that its actions were designed to preclude any "possible invocation by carriers of the filed rate doctrine." *Id.* at 1139 n.7 (quoting Notice of Proposed Rule Making, 11 F.C.C.R. 7,141, at ¶31).

The actions of both Congress and FCC in *Ting* are radically different from the actions of Congress and DOT here. In *Gallo*, the Court observed that the "legislative changes . . . reflected in *Ting*[] did not occur in the energy arena." *Gallo*, 503 F.3d at 1042. Likewise here, Congress did not grant DOT authority to completely deregulate the international airline industry. To the contrary, it expressly reaffirmed DOT's authority over international air transportation rates when it enacted the IATCA. *See supra* Section I.A.

DOT's response to the IATCA, moreover, was completely different from FCC's response to the Telecommunications Act. Unlike in *Ting*, where FCC immediately, fully, and unconditionally renounced regulatory authority over rates, DOT here continued to require the filing of all rates for 20 years. When it finally did exempt some—but not all—rates from filing in 1999, DOT (i) expressly

32

reasserted its authority over unfiled rates, (ii) reserved its right to reinstate filing requirements as necessary, and (iii) continued to monitor unfiled rates, among other ways, through a complaint process. *See supra* Section I.B.[3]

### 2. DOT's express reservation of authority over unfiled rates was entitled to deference.

In announcing its tiered filing regime in the late 1990s, DOT expressly maintained the "ability to intervene in passenger pricing matters should it be necessary" and the right to "take action directly against unfiled" rates. ER169 (62 Fed. Reg. at 10,763). These DOT pronouncements are the exact opposite of FCC's express disavowal of continued oversight in *Ting*. The district court nevertheless ignored these clear assertions of regulatory intent based on (i) the fact that the statements were made before the class period, and (ii) the court's estimation that the statements were "difficult to believe." ER20. Neither of these justifications withstands scrutiny.

*First*, the district court disregarded DOT's statements because they were "made before the class period, which began in 2000." ER20. The district court, however, did not cite any authority for the surprising proposition that an agency pronouncement—published in the Federal Register and never rescinded—may be disregarded merely because of its age. This Court, moreover, has relied upon far

---

[3] Although there was a complaint process in *Ting*, FCC there had affirmatively disavowed all regulation of rates. *See* 319 F.3d at 1143-44.

older statements in holding that an agency did not abdicate its authority. *See Gallo*, 503 F.3d at 1038, 1041 (relying upon regulatory statements from 1992 in determining that agency did not abdicate its authority with respect to rates charged in the 2000s).

*Second*, the district court disregarded DOT's pronouncements because it found them "difficult to believe." ER20.[4] But it was not the district court's place to pass judgment on the plausibility of DOT's statement that it could effectively regulate unfiled rates and would continue to do so. *See Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) ("Agencies are entitled to deference to their interpretation of their own regulations."). By declining to defer to DOT's own interpretation of its regulations, the district court erred. *See supra* Section I.B.2; *see also Auer*, 519 U.S. at 461; *Bassiri*, 463 F.3d at 930.

### 3.     It is irrelevant whether DOT accessed unfiled fares.

The district court also found abdication based on a purported lack of evidence that "DOT can, or ever did, access the unfiled air fares." ER24. But that conclusion runs afoul of ample precedent.

---

[4] The district court premised its disbelief in part on testimony estimating that fewer than ten DOT user accounts were created to monitor filings in a particular database. ER20, ER382-ER383. However, the same witness testified that she did not know how many employees had access to each account or how frequently each account was used. ER382-ER383 ("I don't know how many we have provided and how many people access it. I just know we provided user IDs and passwords."). Therefore, this evidence does nothing to establish how frequently DOT monitored filed rates, even assuming such evidence were relevant.

Under settled law, the filed rate doctrine applies irrespective of whether rates are actually reviewed or approved by the regulator. *See Square D*, 476 U.S. at 417 & n.19 (filed rate doctrine applies to rates not "'investigated and approved'" by agency); *Carlin*, 705 F.3d at 872 ("meaningful agency review" of rates not a prerequisite for application of the filed rate doctrine). Indeed, the filed rate doctrine applies to market-based rates where, by definition, the rates cannot be "accessed" by the agency through a centralized government filing system. *See, e.g.*, *Gallo*, 503 F.3d at 1039-43; *Wah Chang*, 507 F.3d at 1225-27; *Grays Harbor*, 379 F.3d at 651-52; *Snohomish Cnty.*, 384 F.3d at 760-61. Accordingly, the district court's decision was inconsistent with settled precedent applying the filed rate doctrine to market-based rates that were *authorized* by an agency, irrespective of whether the rates were actually reviewed or approved by the agency. *E.g.*, *Carlin*, 705 F.3d at 871-72.

### 4. The frequency with which DOT's complaint process was used is immaterial.

The district court also based its abdication ruling on its belief that DOT's complaint process was not "actually used" by consumers to challenge rates. ER23. The district court's belief is unsupported by the record and, in any event, application of the filed rate doctrine does not turn on the frequency with which consumers elect to use an available complaint process.

As a threshold matter, consumers *have* used DOT's complaint process to challenge international airline pricing. For example, in 2012, a consumer filed a complaint and request for investigation against Delta and other airlines challenging, among other things, the "lawfulness of the $250 international change fee" as contrary to the "legal mandate of a 'reasonable' charge for a change penalty." ER194. As recently as September 2014, DOT issued an order resolving a consumer complaint regarding an airline's implementation of and representations about fuel surcharges. ER100-ER106. DOT has also fielded consumer complaints against American Airlines and Cathay Pacific relating to their fuel surcharges. ER292-ER307.

Nor is the frequency of consumer complaints relevant to the question of whether a regulator has abdicated its statutory authority. Far from reflecting abdication, a low volume of complaints by consumers is entirely consistent with a well-regulated, well-functioning competitive market.

This Court, moreover, has never conditioned application of the filed rate doctrine on the frequency of consumer complaints. For example, this Court applied the filed rate doctrine to the natural gas market in *Gallo* because FERC stated that it "would continue to 'monitor the operation of the market through the complaint process,'" without undertaking to determine whether market participants actually used that complaint process. *See* 503 F.3d at 1038 (quoting 57 Fed. Reg.

36

at 57,958). And in *Cabotage*, the record reflects that only one complaint had ever been filed with the agency. *See In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d 1250, 1270 n.11 (W.D. Wash. 2009) (discussing complaint filed by Guam); *see also* Br. of Appellants, *Cabotage II*, 2011 WL 2455536, at *15 (Apr. 1, 2011) (citing the Guam complaint as the "only complaint filed . . . to challenge the reasonableness of cabotage rates"). Accordingly, application of the filed rate doctrine does not turn on the frequency with which a complaint process is used. Rather, the doctrine must be applied so long as consumers are able to challenge rates through a complaint process. *E.g.*, *Cabotage II*, 450 F. App'x at 689 (applying the filed rate doctrine because there was nothing to suggest that "those aggrieved are unable to challenge the underlying rates . . . through the complaint process").

**5.  The district court's distinction between filed and unfiled rates turns agency deference on its head.**

The district court concluded that DOT, by adopting a tiered rate-filing regime under which only some rates must be filed, abdicated its regulatory authority over the unfiled rates. ER19. That conclusion, however, turns deference to the expert agency on its head.

The filed rate doctrine is designed to promote deference to agency expertise in assessing the reasonableness of rates. *Carlin*, 705 F.3d at 868. But under the district court's ruling, the rates that DOT has determined to be most in need of

scrutiny—the actually filed rates—are subject to no judicial oversight. By contrast, the rates that DOT has determined to be least in need of scrutiny—the unfiled rates—are subject to intrusive judicial regulation in the form of antitrust damages actions. This backward result further illustrates the error of the decision below.

*     *     *

In short, under this Court's precedent, the filed rate doctrine applies to *all* of the rates at issue in this case, irrespective of whether they were literally filed with DOT.

## II.    The Filed Rate Doctrine Applies To Fuel Surcharges.

The district court also refused to apply the filed rate doctrine to fuel surcharges. This holding was erroneous for two independent reasons.

*First*, airlines are unambiguously required to file all surcharges, including fuel surcharges, with DOT. Under settled precedent, the filed rate doctrine plainly applies to such charges. While the district court concluded that DOT did not require fuel surcharges to be filed, that conclusion was simply incorrect.

*Second*, DOT did not abdicate its authority over fuel surcharges. Just as with unfiled rates, DOT has exercised oversight of airline fuel surcharges, among other ways, through a complaint process. Fuel surcharges, moreover, have been a

special focus of DOT's regulatory efforts. Accordingly, the district court erred in holding that DOT abdicated its authority over fuel surcharges.

### A. The Filed Rate Doctrine Applies Because Fuel Surcharges Were Required To Be Filed.

Abundant authority holds that, where a rate is actually required to be filed with an agency, the filed rate doctrine applies. *E.g.*, *Square D*, 476 U.S. at 417 n.19; *Town of Norwood v. New England Power Co.*, 202 F.3d 408, 419 (1st Cir. 2000) ("It is the *filing* of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine."); *see* ER15-ER19 (applying the filed rate doctrine to filed air fares in this case).[5] Because DOT unequivocally requires airlines to file fuel surcharges, the filed rate doctrine bars plaintiffs' damages claims relating to those charges.[6]

---

[5] *See also Ark. La. Gas Co.*, 453 U.S. at 578-79; *AT&T v. Cent. Office Tel.*, 524 U.S. 214 (1998); *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 929 (9th Cir. 2002) ("filed rate doctrine provides that . . . antitrust law . . . may not be used to invalidate a filed rate"); *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876 (10th Cir. 2011); *Wegoland*, 27 F.3d at 21; *Crumley v. Time Warner Cable, Inc.*, 556 F.3d 879, 881 (8th Cir. 2009); *Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 680-81 (8th Cir. 2009); *McCray v. Fidelity Nat'l Title Ins. Co*., 682 F.3d 229 (3d Cir. 2012); *Dreamscape Design v. Affinity Network*, 414 F.3d 665, 668-70 (7th Cir. 2005).

[6] Fuel surcharges fall within DOT's statutory grant of authority over international airline "prices." 49 U.S.C. § 40102(a)(39) (defining a "price" as any "rate, fare, or charge"); *see also* ER1 (recognizing that Congress gave DOT authority over fuel surcharges).

When DOT exempted some fares from filing in 1999, it left stringent filing requirements in place for a number of other rates and charges. Among these were fuel surcharges. In the course of implementing its tiered rate-filing structure in 1999, DOT stated flatly that "all surcharges are to be filed." ER707. DOT, moreover, has never given any indication that it was revoking or altering this straightforward requirement, whether by formal notice or otherwise. Accordingly, DOT's interpretation of its regulations as requiring fuel surcharges to be filed is entitled to deference. *See Auer*, 519 U.S. at 461 (applying "deferential standard" that agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation" (quotation marks and citation omitted)); *see also Bassiri*, 463 F.3d at 930.

DOT has required the filing of all surcharges since the enactment of the IATCA in 1979. Until 2004, this filing requirement helped DOT enforce its prohibition on carrier-imposed surcharges, which DOT adopted to ensure that the advertised "headline" fare for a ticket was the all-in price. When airlines sought to impose fuel surcharges, they would file them with DOT, which would then disapprove them. ER405-ER406, ER415-ER416, ER226-ER233, ER422; *see also* ER245 (plaintiffs' expert declaring that he saw disapprovals of fuel surcharges in review of database). In this way, DOT's filing requirements furthered its

40

regulatory goal of ensuring that airlines reflected fuel costs in the base fare, not in surcharges.

In October 2004, DOT changed course and announced that airlines would be allowed to start imposing separate fuel surcharges. ER161. According to the district court, DOT's announcement "permitted, but did not require, carriers to file surcharges." ER25. But the announcement did not say that the *filing* of fuel surcharges would henceforth be optional. *See* ER161-ER162. Nothing in the announcement, moreover, supports the district court's apparent conclusion that DOT implicitly overruled its prior unambiguous requirement that all surcharges be filed.

The district court relied upon a passage in the announcement stating that carriers "are free to file surcharges in general rules tariffs." ER10-ER11 (citing ER161). Contrary to the district court's reading, however, that statement merely described one *procedural* option by which airlines could comply with DOT's filing mandate. It in no way altered the pre-existing *substantive* requirement that "all surcharges are to be filed." ER707.

Subsequent DOT actions further undermine the district court's belief that fuel surcharges need not be filed. In a November 2004 formal rulemaking, DOT recognized that fuel surcharges were being "filed . . . in tariffs" as general rules— without in any way suggesting that such filings were optional. ER373 (Notice of

41

Disclosure, 69 Fed. Reg. 65,676, 65,677 (Nov. 15, 2004)); *see also* ER421, ER425-ER426 (establishing that defendant Philippine Airlines filed proposed fuel surcharges in general rules tariffs). There is no record evidence that these filings were undertaken gratuitously. Nor, given the time and expense involved in submitting filings to DOT, would it make sense for an airline to file rates unless it was required to do so. *See* ER202 (64 Fed. Reg. at 40,657) (estimating that carriers would spend 650,000 hours a year complying with tiered rate-filing requirements).

When airlines filed fuel surcharges, moreover, DOT took the affirmative step of marking them as "Approved" in a computerized filing database. ER694-ER695, ER428, ER238. Accordingly, DOT's own actions after its October 2004 announcement further support the conclusion that fuel surcharges were required to be filed during the class period.[7]

In sum, because fuel surcharges were required to be filed with DOT, the filed rate doctrine bars plaintiffs' damages claims based on those charges.

---

[7] Plaintiffs argued below that the filed rate doctrine does not apply to fuel surcharges to the extent that (i) an airline did not file the surcharge, or (ii) the surcharge was not actually received by DOT because of mistakes made by the filing agent. However, those factors are irrelevant to application of the filed rate doctrine. *Cabotage I*, 647 F. Supp. 2d at 1266 (rejecting argument that "an improperly filed rate cannot be used to assert" the filed rate doctrine); *Sec. Servs., Inc. v. K Mart Corp.*, 511 U.S. 431, 442 (1994) ("neither procedural irregularity nor unreasonableness nullifies a filed rate").

**B.    The Filed Rate Doctrine Applies Because DOT Did Not Abdicate Its Authority Over Fuel Surcharges.**

Although the requirement that fuel surcharges be filed is by itself sufficient to require application of the filed rate doctrine, DOT's regulation of fuel surcharges went beyond filing requirements.  After DOT allowed the filing of separate surcharges in 2004, it extensively regulated those surcharges by (i) scrutinizing carriers' attempts to impose surcharges, (ii) monitoring and adjudicating complaints regarding surcharges, and (iii) regulating surcharges through DOT's control over airline advertising.  This regulatory activity belies the district court's conclusion that DOT "abdicated" its authority over fuel surcharges.

**1.    DOT extensively regulated fuel surcharges.**

After permitting airlines to file separate surcharges in 2004, DOT regulators subjected requests to impose fuel surcharges to rigorous scrutiny.  For instance, when Philippine Airlines first sought to introduce a fuel surcharge in 2004, DOT officials "questioned the need for a fuel surcharge and whether the surcharge should be broken out separately from the base fare or included in the base fare." ER422.  DOT approved the surcharge only after "an extended period of discussion and negotiation," and on the condition that the airline list the surcharge "in a separate code on tickets."  *Id.*

In addition, DOT monitors surcharges through its complaint process, and has actually adjudicated complaints regarding fuel surcharges.  ER100-ER106, ER293-

43

ER307.  As explained above, the existence of the complaint process alone triggers the application of the filed rate doctrine.  *See Gallo*, 503 F.3d at 1038 (filed rate doctrine applied to rates because agency pledged to "'monitor the operation of the market through the complaint process'" (quoting 57 Fed. Reg. at 57,958)); *Cabotage II*, 450 F. App'x at 689 (doctrine applied because there was "nothing to suggest that those aggrieved are unable to challenge the underlying rates before the [agency] through a complaint process").

Finally, DOT regulated fuel surcharges through its authority to prevent deceptive advertising.  Initially, when DOT began allowing airlines to impose standalone fuel surcharges in 2004, DOT prohibited airlines from listing surcharges separately in fare advertisements—the all-in price was the only one that could be listed.  ER161-ER162 (citing 14 C.F.R. § 399.84).  Though DOT later allowed advertising of carrier-imposed surcharges as a separate line-item, it imposed strict requirements for doing so.  Specifically, it mandated that fuel surcharges accurately reflect "the fuel cost over some reasonable baseline for an individual passenger for that trip" and that the carrier be prepared to document these costs.  Additional Guidance on Airfare/Air Tour Price Advertisements, 77 Fed. Reg. 11,618, 11,619 (Feb. 27, 2012).  Thus, customers can challenge fuel surcharges at DOT when they believe the surcharges do not reflect actual fuel costs.  ER100-ER106.

44

### 2. The district court erred in holding that DOT abdicated its authority over fuel surcharges.

In light of DOT's extensive supervision of fuel surcharges, the district court erred in holding that DOT abdicated its authority over those charges.

The principal rationale offered by the district court was a November 2004 announcement from DOT that it would no longer allow airlines to designate fuel surcharges as "government-approved" in fare advertising. ER25. According to the district court, the statement indicated that DOT did not intend to regulate fuel surcharges. *Id.* But that conclusion is contrary to DOT's own rationale for its prohibition. DOT explained that its advertising rules were meant to ensure customers knew that such surcharges were imposed by the airlines, not the government—a necessary change given past rules allowing airlines to advertise certain surcharges as "government-approved." ER373-ER374 (69 Fed. Reg. at 65,676-77) (explaining that DOT had allowed airlines to advertise security surcharges as "government-approved"); *see also* 77 Fed. Reg. at 11,619 (fuel surcharges "are not government-imposed taxes and fees, and it is an unfair and deceptive practice . . . to lead consumers to believe that they are").

The district court also pointed to a statement in the same regulation about carriers filing surcharges "separately from the 'base' fare in tariffs, a situation that the Department cannot effectively monitor." ER373 (69 Fed. Reg. at 65,677). But viewed in context, this statement simply reflects the challenge DOT faced in

45

monitoring advertisements because fuel surcharges were often filed in general

rules that would apply across a number of different routes:

> [T]he desire of carriers to pass on the higher costs of certain expenses discretely, such as insurance and fuel, has led to such expenses being filed separately from the "base" fare in tariffs, a situation that the Department cannot effectively monitor.[3] In view of these developments, the Enforcement Office will no longer allow the separate listing of "government-approved" surcharges in fare advertising.
>
> n.3: In open-skies and other markets governed by bilateral agreements containing double-disapproval pricing articles, the Department has exempted carriers from fare filing.

ER373-ER374.

By this language, DOT was explaining that a prohibition on advertising

"government-approved" surcharges was needed because airlines submitted

surcharges and fares in separate electronic filings, making it difficult to evaluate

fare advertisements. Moreover, because in some instances the base fares would be

exempt from filing (the subject of note 3), the surcharge could not be readily

evaluated alongside the fare. This does not mean, as the district court held, that the

DOT was not monitoring surcharges. To the contrary, the very sentence

referenced by the district court says that surcharges *were* being filed with DOT.[8]

---

[8] The district court also stated that it saw "no evidence that DOT actively regulated fuel surcharges" before DOT started permitting airlines to impose separate fuel surcharges in 2004. ER25. But this is irrelevant because, as plaintiffs

46

For these reasons, the district court erred in discounting DOT's extensive regulatory activities and refusing to apply the filed rate doctrine to fuel surcharges.

## III. The Filed Rate Doctrine Applies To Rates Filed With Foreign Regulators.

The district court also erred by refusing to apply the filed rate doctrine to rates and surcharges that were filed with and approved by foreign regulators. That error provides an additional, independent ground on which to reverse the district court's decision insofar as it applies to foreign-filed rates.

The filed rate doctrine is rooted in the principle that courts should "defer[] to agencies' greater expertise in rate-setting." *Carlin*, 705 F.3d at 880 (citing *Wegoland*, 27 F.3d at 21). Unlike expert regulators, courts lack the "institutional competence" to assess the reasonableness of rates, and so are "ill-suited to systematically second guess the regulators' decisions." *Wegoland*, 27 F.3d at 21. This rationale for the filed rate doctrine applies with equal force to rates that are filed with foreign regulators.

While the district court suggested that the doctrine applies only to rates regulated by the federal government, ER24 n.33, that is not so. For example, courts routinely apply the filed rate doctrine to bar claims challenging rates filed

---

concede, the surcharges at issue all post-date October 2004. *Id.* It also ignores the fact that DOT *did* regulate pre-October 2004 surcharges by prohibiting airlines from imposing them altogether—the most intrusive form of regulation that DOT could choose. *See* ER405-ER406, ER415-ER416, ER226-ER233, ER245.

with state regulatory agencies. *Cost Mgmt. Servs. v. Wash. Natural Gas Co.*, 99 F.3d 937, 943 n.7 (9th Cir. 1996) ("[W]e have also applied the 'Keogh doctrine' in cases involving state regulatory agencies."); *accord Wegoland*, 27 F.3d at 20 ("courts have uniformly held, and we agree, that the rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies").[9] As these decisions recognize, post-hoc judicial review of government-approved rates would "unduly subvert the regulating agencies' authority and thereby undermine the stability of the system." *Wegoland*, 27 F.3d at 21.

This concern for stability—and the related need to protect the settled expectations of regulated parties—applies fully to rates approved by foreign regulators. If anything, the concern is even more acute in the case of rates approved by foreign governments, where judicial second-guessing of rates could disturb international comity and U.S. foreign relations.

It has long been recognized that principles of comity provide a "special reason for deference" to DOT in the field of international aviation. *Pan Am. World Airways v. C.A.B.*, 517 F.2d 734, 745-46 (2d Cir. 1975). By the very nature of international air travel, "the regulatory authority of one nation necessarily can be

---

[9]  *See also McCray v. Fidelity Nat'l Title Ins. Co.*, 682 F.3d 229 (3d Cir. 2012); *Tex. Comm. Energy v. TXU Energy, Inc.*, 413 F.3d 503 (5th Cir. 2005); *H.J. Inc. v. Nw. Bell Tel.Co.*, 954 F.2d 485 (8th Cir. 1992); *Taffet v. S. Co.*, 967 F.2d 1483 (11th Cir. 1992) (en banc).

exercised only with the acquiescence of the other." *Id*. Accordingly, there is an "obvious need for cooperation, coordination and mutual agreement" among different countries. *Id.*

In "regulating commercial relations with foreign governments," moreover, it is essential that the United States "speak with one voice." *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 448-49 (1979) (quotation marks omitted). With respect to international air travel, that "one voice" belongs to DOT: Congress has delegated to DOT exclusive authority over international aviation, and has recognized that DOT must consider "international comity and foreign policy" concerns in exercising that authority, *see* 49 U.S.C. § 41309(b)(1)(A).

In accordance with its congressional mandate, DOT exercised its "international aviation policy judgment" and took "foreign government actions" into account when implementing its tiered rate-filing regime. ER201, ER199 (64 Fed. Reg. at 40,656, 40,654). Indeed, DOT's determination of whether a given airline is required to file rates in the United States is based in part on the "policies or actions" of the airline's home government. ER166 (62 Fed. Reg. at 10,760). In other words, DOT regulates international airline pricing in light of the conduct of its foreign counterparts, including the rate-filing requirements of those foreign governments.

49

Here, the undisputed evidence is that defendants were required to file many of the fares and surcharges at issue with aviation authorities in Hong Kong, Japan, and the Philippines:

- **Hong Kong.** Throughout the class period, airlines flying to Hong Kong had to file all fares and surcharges with the Hong Kong Civil Aviation Department pursuant to an Air Services Agreement between Hong Kong and the United States. ER682. The Civil Aviation Department then would send the airline an official letter indicating whether the filing had been approved. ER687.

- **Japan.** For flights to Japan, Japanese law requires that foreign carriers "shall fix tariffs and charges for passenger" flights and "obtain approval from the Minister of Land, Infrastructure, Transport and Tourism." ER776; *see also* ER782 (providing for fine up to one million yen for "levying tariffs or charges without obtaining approval").

- **The Philippines.** The Philippines Civil Aeronautics Board is charged with the power to "fix and determine reasonable . . . rates, charges or fares" that airlines wish to charge on flights to the Philippines. ER440. The Board has exercised this regulatory authority by affirmatively approving rates and by fining airlines who do not file tariffs in advance. ER422-ER423, ER467-ER468.

Defendants submitted evidence that they complied with the filing requirements imposed by these foreign governments. ER422-ER423, ER765-ER766.

DOT understood that these filed rates and charges needed to be approved by foreign aviation authorities before they could be levied. Indeed, the rates could never have been charged at all without the "acquiescence" of DOT in the decisions of these foreign regulators. *See Pan Am. World Airways*, 517 F.2d at 745-46. To permit judicial second-guessing of these rates would upset the delicate balance

DOT has struck with multiple foreign nations, and thereby inappropriately insert the courts into matters that "are committed to the Legislature and the Executive, not the Judiciary." *Zivotofsky v. Kerry*, 135 S.Ct. 2076, 2081 (2015).

## CONCLUSION

For the reasons stated above, the district court's order denying summary judgment in part should be reversed, and the case remanded with instructions to dismiss plaintiffs' damages claims.

Dated:  July 6, 2015                    Respectfully submitted,

COVINGTON & BURLING LLP

By: _/s/ Anita F. Stork_____
      Anita F. Stork

*Attorneys for Defendant-Appellant*
*Philippine Airlines, Inc.*


CONDON & FORSYTH LLP

By: _/s/ Michael J. Holland_____
      Michael J. Holland

*Attorneys for Defendant-Appellant*
*Air New Zealand Ltd.*


SQUIRE PATTON BOGGS (U.S.) LLP

By: _/s/ James V. Dick_____
      James V. Dick

*Attorneys for Defendant-Appellant*
*China Airlines Ltd.*


KIRKLAND & ELLIS LLP

By: _/s/ Tammy A. Tsoumas_____
      Tammy A. Tsoumas

*Attorneys for Defendant-Appellant*
*EVA Airways Corp.*

## STATEMENT OF RELATED CASES

The related appeal *Wortman, et al. v. All Nippon Airways*, Ninth Circuit No. 15-15362, is also proceeding in this Court.  Undersigned counsel is aware of no other related appeals proceeding in this or in any other court.


_____*/s/ Anita F. Stork*_____
Anita F. Stork

*Attorneys for Defendant-Appellant*
*Philippine Airlines, Inc.*

Dated:  July 6, 2015

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,639 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), as calculated by the word processing system used to prepare the document.

2.     The brief further complies with the requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface of 14 points or more.


Dated:  July 6, 2015                           Respectfully submitted,

                                                             COVINGTON & BURLING LLP


                                                             By: */s/ Anita F. Stork*
                                                                    Anita F. Stork

                                                             *Attorneys for Defendant-Appellant*
                                                             *Philippine Airlines, Inc.*

54

## APPENDIX OF STATUTES AND REGULATIONS INVOLVED

### 49 U.S.C. § 40101: Policy

(a) Economic regulation.-- In carrying out subpart II of this part and those provisions of subpart IV applicable in carrying out subpart II, the Secretary of Transportation shall consider the following matters, among others, as being in the public interest and consistent with public convenience and necessity: …

    (9) preventing unfair, deceptive, predatory, or anticompetitive practices in air transportation. …

### 49 U.S.C. § 40102: Definitions

(a) General definitions.-- In this part-- …

    (39) "price" means a rate, fare, or charge. …

### 49 U.S.C. § 40109: Authority to exempt

[…]

(c) Other economic regulation.-- Except as provided in this section, the Secretary may exempt to the extent the Secretary considers necessary a person or class of persons from a provision of chapter 411[1] chapter 413 (except sections 41307 and 41310(b)-(f)), chapter 415 (except sections 41502, 41505, and 41507-41509), chapter 417 (except sections 41703, 41704, 41710, 41713, and 41714), chapter 419, subchapter II of chapter 421, and sections 44909 and 46301(b) of this title, or a regulation or term prescribed under any of those provisions, when the Secretary decides that the exemption is consistent with the public interest.

### 49 U.S.C. § 41501: Establishing reasonable prices, classifications, rules, practices, and divisions of joint prices for foreign air transportation

Every air carrier and foreign air carrier shall establish, comply with, and enforce--

(1) reasonable prices, classifications, rules, and practices related to foreign air transportation…

## 49 U.S.C. § 41504. Tariffs for foreign air transportation

(a) Filing and contents.--

In the way prescribed by regulation by the Secretary of Transportation, every air carrier and foreign air carrier shall file with the Secretary, publish, and keep open to public inspection, tariffs showing the prices for the foreign air transportation provided between places served by the carrier and provided between places served by the carrier and places served by another air carrier or foreign air carrier with which through service and joint prices have been established. A tariff--

    (1) shall contain--

        (A) to the extent the Secretary requires by regulation, a description of the classifications, rules, and practices related to the foreign air transportation;

        (B) a statement of the prices in money of the United States; and

        (C) other information the Secretary requires by regulation; and

    (2) may contain--

        (A) a statement of the prices in money that is not money of the United States; and

        (B) information that is required under the laws of a foreign country in or to which the air carrier or foreign air carrier is authorized to operate.

(b) Changes.--

    (1) Except as provided in paragraph (2) of this subsection, an air carrier or foreign air carrier may change a price or a classification, rule, or practice affecting that price or the value of the transportation provided under that price, specified in a tariff of the carrier for foreign air transportation only

after 30 days after the carrier has filed, published, and posted notice of the proposed change in the same way as required for a tariff under subsection (a) of this section. However, the Secretary may prescribe an alternative notice requirement, of at least 25 days, to allow an air carrier or foreign air carrier to match a proposed change in a passenger fare or a charge of another air carrier or foreign air carrier. A notice under this paragraph must state plainly the change proposed and when the change will take effect.

(2) If the effect of a proposed change would be to begin a passenger fare that is outside of, or not covered by, the range of passenger fares specified under section 41509(e)(2) and (3) of this title, the proposed change may be put into effect only on the expiration of 60 days after the notice is filed under regulations prescribed by the Secretary.

(c) Rejection of changes.-- The Secretary may reject a tariff or tariff change that is not consistent with this section and regulations prescribed by the Secretary. A tariff or change that is rejected is void.

## 49 U.S.C. § 41509. Authority of the Secretary of Transportation to suspend, cancel, and reject tariffs for foreign air transportation

(a) Cancellation and rejection.--

(1) On the initiative of the Secretary of Transportation or on a complaint filed with the Secretary, the Secretary may conduct a hearing to decide whether a price for foreign air transportation contained in an existing or newly filed tariff of an air carrier or foreign air carrier, a classification, rule, or practice affecting that price, or the value of the transportation provided under that price, is lawful. The Secretary may begin the hearing at once and without an answer or another formal pleading by the air carrier or foreign air carrier, but only after reasonable notice. If, after the hearing, the Secretary decides that the price, classification, rule, or practice is or will be unreasonable or unreasonably discriminatory, the Secretary may cancel or reject the tariff and prevent the use of the price, classification, rule, or practice.

(2) With or without a hearing, the Secretary may cancel or reject an existing or newly filed tariff of a foreign air carrier and prevent the use of a price,

classification, rule, or practice when the Secretary decides that the cancellation or rejection is in the public interest.

(3) In deciding whether to cancel or reject a tariff of an air carrier or foreign air carrier under this subsection, the Secretary shall consider--

>(A) the effect of the price on the movement of traffic;

>(B) the need in the public interest of adequate and efficient transportation by air carriers and foreign air carriers at the lowest cost consistent with providing the transportation;

>(C) the standards prescribed under law related to the character and quality of transportation to be provided by air carriers and foreign air carriers;

>(D) the inherent advantages of transportation by aircraft;

>(E) the need of the air carrier and foreign air carrier for revenue sufficient to enable the air carrier and foreign air carrier, under honest, economical, and efficient management, to provide adequate and efficient air carrier and foreign air carrier transportation;

>(F) whether the price will be predatory or tend to monopolize competition among air carriers and foreign air carriers in foreign air transportation;

>(G) reasonably estimated or foreseeable future costs and revenues for the air carrier or foreign air carrier for a reasonably limited future period during which the price would be in effect; and

>(H) other factors.

(b) Suspension.--

>(1)(A) Pending a decision under subsection (a)(1) of this section, the Secretary may suspend a tariff and the use of a price contained in the tariff or a classification, rule, or practice affecting that price.

(B) The Secretary may suspend a tariff of a foreign air carrier and the use of a price, classification, rule, or practice when the suspension is in the public interest.

(2) A suspension becomes effective when the Secretary files with the tariff and delivers to the air carrier or foreign air carrier affected by the suspension a written statement of the reasons for the suspension. To suspend a tariff, reasonable notice of the suspension must be given to the affected carrier.

(3) The suspension of a newly filed tariff may be for periods totaling not more than 365 days after the date the tariff otherwise would go into effect. The suspension of an existing tariff may be for periods totaling not more than 365 days after the effective date of the suspension. The Secretary may rescind at any time the suspension of a newly filed tariff and allow the price, classification, rule, or practice to go into effect.

(c) Effective tariffs and prices when tariff is suspended, canceled, or rejected.--

(1) If a tariff is suspended pending the outcome of a proceeding under subsection (a) of this section and the Secretary does not take final action in the proceeding during the suspension period, the tariff goes into effect at the end of that period subject to cancellation when the proceeding is concluded.

(2)(A) During the period of suspension, or after the cancellation or rejection, of a newly filed tariff (including a tariff that has gone into effect provisionally), the affected air carrier or foreign air carrier shall maintain in effect and use--

(i) the corresponding seasonal prices, or the classifications, rules, and practices affecting those prices or the value of transportation provided under those prices, that were in effect for the carrier immediately before the new tariff was filed; or

(ii) another price provided for under an applicable intergovernmental agreement or understanding.

(B) If the suspended, canceled, or rejected tariff is the first tariff of the carrier for the covered transportation, the carrier, for the purpose of operations during the period of suspension or pending effectiveness of a new tariff, may file another tariff containing a price or another

classification, rule, or practice affecting the price, or the value of the transportation provided under the price, that is in effect (and not subject to a suspension order) for any air carrier providing the same transportation.

3) If an existing tariff is suspended or canceled, the affected air carrier or foreign air carrier, for the purpose of operations during the period of suspension or pending effectiveness of a new tariff, may file another tariff containing a price or another classification, rule, or practice affecting the price, or the value of the transportation provided under the price, that is in effect (and not subject to a suspension order) for any air carrier providing the same transportation.

(d) Response to refusal of foreign country to allow air carrier to charge a price.-- When the Secretary finds that the government or an aeronautical authority of a foreign country has refused to allow an air carrier to charge a price contained in a tariff filed and published under section 41504 of this title for foreign air transportation to the foreign country--

(1) the Secretary, without a hearing--

(A) may suspend any existing tariff of a foreign air carrier providing transportation between the United States and the foreign country for periods totaling not more than 365 days after the date of the suspension; and

(B) may order the foreign air carrier to charge, during the suspension periods, prices that are the same as those contained in a tariff (designated by the Secretary) of an air carrier filed and published under section 41504 of this title for foreign air transportation to the foreign country; and

(2) a foreign air carrier may continue to provide foreign air transportation to the foreign country only if the government or aeronautical authority of the foreign country allows an air carrier to start or continue foreign air transportation to the foreign country at the prices designated by the Secretary.…

**49 U.S.C. § 46101. Complaints and investigations**

(a)  General.--

(1) A person may file a complaint in writing with the Secretary of Transportation (or the Under Secretary of Transportation for Security with respect to security duties and powers designated to be carried out by the Under Secretary or the Administrator of the Federal Aviation Administration with respect to aviation safety duties and powers designated to be carried out by the Administrator) about a person violating this part or a requirement prescribed under this part. Except as provided in subsection (b) of this section, the Secretary, Under Secretary, or Administrator shall investigate the complaint if a reasonable ground appears to the Secretary, Under Secretary, or Administrator for the investigation.

 (2) On the initiative of the Secretary, Under Secretary, or Administrator, as appropriate, the Secretary, Under Secretary, or Administrator may conduct an investigation, if a reasonable ground appears to the Secretary, Under Secretary, or Administrator for the investigation, about—

 (A) a person violating this part or a requirement prescribed under this part; or

 (B) any question that may arise under this part.

 (3) The Secretary of Transportation, Under Secretary, or Administrator may dismiss a complaint without a hearing when the Secretary, Under Secretary, or Administrator is of the opinion that the complaint does not state facts that warrant an investigation or action.

 (4) After notice and an opportunity for a hearing and subject to section 40105 (b) of this title, the Secretary of Transportation, Under Secretary, or Administrator shall issue an order to compel compliance with this part if the Secretary, Under Secretary, or Administrator finds in an investigation under this subsection that a person is violating this part….

## 14 C.F.R. § 293.10. Exemption

(a) Air carriers and foreign air carriers are exempted from the duty to file passenger tariffs with the Department of Transportation, as required by 49 U.S.C. 41504 and 14 CFR part 221, as follows:

> (1) The Assistant Secretary for Aviation and International Affairs will, by notice, issue and periodically update a list establishing the following categories of markets:

>> (i) In Category A markets, carriers are exempted from the duty to file all passenger tariffs unless they are nationals of countries listed in Category C, or are subject to the provisions of paragraph (c) of this section.

>> (ii) In Category B markets, carriers are exempted from the duty to file all passenger tariffs except those setting forth one-way economy-class fares and governing provisions thereto, unless they are nationals of countries listed in Category C, or are subject to the provisions of paragraph (c) of this section.

>> (iii) In Category C markets, carriers shall continue to file all passenger tariffs, except as provided in § 293.10(b);

> (2) The Assistant Secretary will list country-pair markets falling in Categories A and C, taking into consideration the factors in paragraphs (a)(2)(i) through (iv) of this section. All country-pair markets not listed in Categories A or C shall be considered to be in Category B and need not be specifically listed.

>> (i) Whether the U.S. has an aviation agreement in force with that country providing double-disapproval treatment of prices filed by the carriers of the Parties;

>> (ii) Whether the country's Government has disapproved or deterred U.S. carrier price leadership or matching tariff filings in any market;

>> (iii) Whether the country's Government has placed significant restrictions on carrier entry or capacity in any market; and

62

(iv) Whether the country's government is honoring the provisions of the bilateral aviation agreement and there are no significant bilateral problems.

(b) By notice of the Assistant Secretary, new country-pair markets will be listed in the appropriate category, and existing country-pair markets may be transferred between categories.

(c) Notwithstanding a determination that a country is in Category A or B, if the Assistant Secretary finds that effective price leadership opportunities for U.S. carriers are not available between that country and any third country, carriers that are nationals of such country may be required to file tariffs, as provided under part 221 or as otherwise directed in the notice, for some or all of their services between the U.S. and third countries.

(d) Air carriers and foreign air carriers are exempted from the duty to file governing rules tariffs containing general conditions of carriage with the Department of Transportation, as required by 49 U.S.C. 41504 and 14 CFR part 221. A description of the general conditions of carriage will be included in the Assistant Secretary's initial notice.

(e) Notwithstanding paragraph (d) of this section, air carriers and foreign air carriers shall file and maintain a tariff with the Department to the extent required by 14 CFR 203.4 and other implementing regulations.

(f) Authority for determining what rules are covered by paragraph (d) of this section and for determining the filing format for the tariffs required by paragraph (e) of this section is delegated to the Director of the Office of International Aviation.


## 14 C.F.R. § 302.404. Formal complaints

(a) Filing. Any person may make a formal complaint to the Assistant General Counsel about any violation of the economic regulatory provisions of the Statute or of the Department's rules, regulations, orders, or other requirements. Every formal complaint shall conform to the requirements of § 302.3 and § 302.4, concerning the form and filing of documents. The filing of a complaint shall result in the institution of an enforcement proceeding only if the Assistant General Counsel

issues a notice instituting such a proceeding as to all or part of the complaint under § 302.406(a) or the Deputy General Counsel does so under § 302.406(c).

(b) Amendment. A formal complaint may be amended at any time before service of an answer to the complaint. After service of an answer but before institution of an enforcement proceeding, the complaint may be amended with the permission of the Assistant General Counsel. After institution of an enforcement proceeding, the complaint may be amended only on grant of a motion filed under § 302.11.

(c) Insufficiency of formal complaint. In any case where the Assistant General Counsel is of the opinion that a complaint does not sufficiently set forth matters required by any applicable rule, regulation or order of the Department, or is otherwise insufficient, he or she may advise the complainant of the deficiency and require that any additional information be supplied by amendment.

(d) Joinder of complaints or complainants. Two or more grounds of complaints involving substantially the same purposes, subject or state of facts may be included in one complaint even though they involve more than one respondent. Two or more complainants may join in one complaint if their respective causes of complaint are against the same party or parties and involve substantially the same purposes, subject or state of facts. The Assistant General Counsel may separate or split complaints if he or she finds that the joinder of complaints, complainants, or respondents will not be conducive to the proper dispatch of the Department's business or the ends of justice.

(e) Service. A formal complaint, and any amendments thereto, shall be served by the person filing such documents upon each party complained of, upon the Deputy General Counsel, and upon the Assistant General Counsel.


## 14 C.F.R. § 302.502. Institution of proceedings

A proceeding to determine the lawfulness of rates, fares, or charges for the foreign air transportation of persons or property by aircraft, or the lawfulness of any classification, rule, regulation, or practice affecting such rates, fares or charges, may be instituted by the filing of a petition or complaint by any person, or by the issuance of an order by the Department.

64

## 14 C.F.R. § 302.505. Order of investigation

The Department, on its own initiative, or if it is of the opinion that the facts stated in a petition or complaint warrant it, may issue an order instituting an investigation of the lawfulness of any present or proposed rates, fares, or charges for the foreign air transportation of persons or property by aircraft or the lawfulness of any classification, rule, regulation, or practice affecting such rates, fares, or charges, and may assign the proceeding for hearing before an administrative law judge. If a hearing is held, except as modified by this subpart, the provisions of § 302.17 through § 302.38 of this part shall apply.

## 14 C.F.R. § 302.17. Administrative law judges

(a) Powers and delegation of authority.

(1) An administrative law judge shall have the following powers, in addition to any others specified in this part:

(i) To give notice concerning and to hold hearings;

(ii) To administer oaths and affirmations;

(iii) To examine witnesses;

(iv) To issue subpoenas and to take or cause depositions to be taken;

(v) To rule upon offers of proof and to receive relevant evidence;

(vi) To regulate the course and conduct of the hearing;

(vii) To hold conferences before or during the hearing for the settlement or simplification of issues;

(viii) To rule on motions and to dispose of procedural requests or similar matters;

(ix) To make initial or recommended decisions as provided in § 302.31;

65

(x) To take any other action authorized by this part or by the Statute.

(2) The administrative law judge shall have the power to take any other action authorized by part 385 of this chapter or by the Administrative Procedure Act.

(3) The administrative law judge assigned to a particular case is delegated the DOT decisionmaker's function of making the agency decision on the substantive and procedural issues remaining for disposition at the close of the hearing in such case, except that this delegation does not apply in cases where the record is certified to the DOT decisionmaker, with or without an initial or recommended decision by the administrative law judge, or in cases requiring Presidential approval under section 41307 of the Statute. This delegation does not apply to the review of rulings by the administrative law judge on interlocutory matters that have been appealed to the DOT decisionmaker in accordance with the requirements of § 302.11….

## 14 C.F.R. § 302.38.  Final decision of the DOT Decisionmaker

When a case stands submitted to the DOT decisionmaker for final decision on the merits, he or she will dispose of the issues presented by entering an appropriate order that will include a statement of the reasons for his or her findings and conclusions. Such orders shall be deemed "final orders" within the purview of § 302.14(a), in the manner provided by § 302.18.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on July 6, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Rani Gupta*
Rani Gupta

Dated: July 6, 2015